IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| Design and Production, Inc., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-899 |
| | ) | |
| American Exhibitions, Inc., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Seruto and Company, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on (1) Plaintiff/Counter-Defendant Design and

Production, Inc. and Third-Party Defendant Seruto and Company's Motion for Summary

Judgment ("D&P's Motion for Summary Judgment") (Dkt. No. 107); (2) Defendant/Counter-

Plaintiff/Third-Party Plaintiff American Exhibitions, Inc.'s Motion for Partial Summary

Judgment ("AEI's Motion for Partial Summary Judgment") (Dkt. No. 113); (3) Design and

Production, Inc. and Seruto and Company's Motion in Limine Regarding Portions of Depositions

in Which Marcus Corwin Participated as Counsel ("D&P's Motion in Limine") (Dkt. No. 109);

and (4) Design and Production, Inc. and Seruto and Company's Motion to Strike AEI's Trial

Exhibits ("D&P's Motion to Strike") (Dkt. No. 120). This case concerns a dispute between

American Exhibitions, Inc. ("AEI") and Design and Production, Inc. ("D&P") regarding the

creation and installation of a traveling exhibit, which AEI hired D&P to design, build, and

supervise installation.

The following issues are before the Court. The first issue is whether the Court should

grant D&P's Motion for Summary Judgment and deny AEI's Motion for Partial Summary

Judgment as to D&P's contract claim against AEI (Count I), where AEI approved the final fixed

price and accepted the exhibit but failed to pay the outstanding invoices. The Court grants

D&P's Motion for Summary Judgment and denies AEI's Motion for Partial Summary Judgment

as to D&P's contract claim because AEI accepted the exhibit and failed to pay the outstanding

balance of the firm fixed price, and AEI's nonperformance is not excused by any material breach

on the part of D&P. The second issue is whether the Court should grant D&P's Motion for

Summary Judgment as to its request for declaratory relief (Count III) because AEI's material

breach of the contract relieves D&P of any subsequent obligations thereunder. The Court grants

D&P's Motion for Summary Judgment as to its request for declaratory relief and declares that

D&P has no further obligations under the contract because AEI's material breach excuses D&P

from future performance. The third issue is whether the Court should grant D&P's Motion for

Summary Judgment and deny AEI's Motion for Partial Summary Judgment as to AEI's breach

of contract claim against D&P and Seruto for failing to comply with the Project Schedule,

charging AEI costs that were not part of the contract, failing to provide lighting services required

under the contract, and providing deficient design and build services (Counter-Complaint/Third-

Party Complaint Count I). The Court grants D&P's Motion for Summary Judgment and denies

AEI's Motion for Partial Summary Judgment as to AEI's contract claim because AEI failed to

offer evidence demonstrating that D&P and Seruto breached the contract. The fourth issue is

whether the Court should grant D&P's Motion for Summary Judgment and deny AEI's Motion

for Partial Summary Judgment as to AEI's fraudulent inducement claim (Counter-

Complaint/Third-Party Complaint Count II), where AEI alleges that D&P made various

fraudulent misrepresentations regarding cost and timing upon which AEI relied in entering into

the contract. The Court grants D&P's Motion for Summary Judgment and denies AEI's Motion

for Partial Summary Judgment as to AEI's fraud claim because the alleged misrepresentations do

not support a cognizable claim, AEI fails to offer evidence of the requisite fraudulent intent, and

AEI waived this claim.  The final issue is whether the Court should grant D&P's Motion for

Summary Judgment and deny AEI's Motion for Partial Summary Judgment as to AEI's

negligent misrepresentation claim (Counter-Complaint/Third-Party Complaint Count III), where

AEI alleges in the alternative to its fraudulent inducement claim that, if D&P did not act with

fraudulent intent, it acted negligently in making misrepresentations upon which AEI relied in

entering into the contract.  The Court grants D&P's Motion for Summary Judgment and denies

AEI's Motion for Partial Summary Judgment as to AEI's negligent misrepresentation claim

because promises of future action are not cognizable under this theory, and the alleged duty

breached arises out of the contract, not in tort.

## I.   BACKGROUND

In 2009, AEI sought vendors to provide design and fabrication services for its Mummies

of the World exhibition ("Exhibit").  AEI needed a vendor to design and build display cases for

the mummies, gallery walls to create the environment, in-case signage to explain the Exhibit

content, and lighting, sound, and graphic murals to provide a "dignified and reverent

atmosphere" to present the Exhibit.  (AEI MSJ Statement Undisputed Facts ¶ 2.)   AEI discussed

with D&P the possibility of D&P performing the work that AEI needed for the Exhibit.  AEI

claims that it informed AEI of its budgetary restrictions and that it was willing to pay $500-

600,000 for the Exhibit and no more than $1 million.  D&P provided AEI with an extensive

proposal. The proposal included that D&P would retain Seruto & Company ("S&C") to perform

the necessary design work. AEI requested that D&P draft a formal contract and committed to

commencement of the first phase of the design process.

In August 2009, AEI, D&P, and S&C participated in a design charrette to explore

concepts for the Exhibit.  Prior to the charrette, D&P and S&C exchanged emails regarding the

concept.  In one email, D&P stated that the $1-1.5 million budget was "wishful thinking" on the

part of AEI for the size show that AEI envisioned, and that the budget should evolve out of the

design process to allow AEI to decide what it wanted and did not want. D&P advised that they would all participate in a kick-off charrette with concept designs and budgets to follow. S&C responded that the cases for the mummies alone would cost $1 million, and AEI would need to spend $1.5-2 million more to compete with other shows. In response, D&P opined that the final budget would be determined by the ultimate design.

In September 2009, D&P submitted three concepts to AEI. Concept A had a projected cost of $2,500,000; Concept B had a projected cost of between $1,500,000 and $2,000,000; and Concept C had a projected cost of between $1,000,000 and $1,500,000. AEI elected to proceed with Concept C, and the parties developed the design and negotiated the terms to incorporate into the ultimate contract.

AGREEEMENT

On December 21, 2009, the parties entered into the contract at issue ("Agreement" or "D&P/AEI Contract"). Pursuant to the Agreement, D&P agreed to provide "all personnel, services, materials and equipment . . . to design, engineer, fabricate, and supervise the installation of the [Exhibit] as described in the Concept Plan and in accordance with this Agreement, specifically the Project Schedule and the Project Budget." (Agreement ¶ 1.1.) As part of the Agreement, S&C executed a joinder pursuant to which S&C agreed to "(i) perform its obligations in accordance with its agreement with D&P; and (ii) continue to perform its obligations directly for Owner in the event D&P defaults on its obligations under the [Agreement] and/or D&P's agreement with S&C." (Agreement 11.)

The work was to be completed in six phases over a period of approximately eleven months. The parties agreed to "exercise their best efforts" to perform their obligations under the Agreement in accordance with the Project Schedule. (Agreement ¶ 1.1(a).) However, D&P acknowledged the "critical importance" of completing the work and preparing the Exhibit for

shipment to the opening venue for the Exhibit opening scheduled for July 1, 2010." (Agreement

at 1, Recitals.)

With respect to the cost of the Exhibit, the Agreement provided:

1.3.    D&P represents and warrants that the Work, including all of the design, engineering, fabrication, and supervision of the installation of the Exhibit at the Opening Venue can be completed for an amount of $1,000,000 to $1,500,000 as set forth on the worksheets attached hereto as **Exhibit D-1 and D-2**. The parties acknowledge that the worksheet attached hereto as **Exhibit D-2** includes certain upgrades that can be completed for the guaranteed maximum amount of $1,500,000, but the Owner may not elect to purchase all of the upgrades.
(a)    At the end of Phase IV of the Project Schedule, D&P shall deliver to Owner a refined line-itemed budget setting forth the actual costs for each element (i.e., casework, walls, lighting, audiovisual software, and hardware, etc.) of the Work. Owner and D&P will mutually agree to and accept the budget, creating a Firm Fixed Price for the work to be performed thereafter. After the Firm Fixed Price is agreed to, the Owner may reasonably add, remove, change, or substitute certain elements of the Work. Any such changes shall be mutually agreed upon in writing by the parties and shall be reflected in a change order to the Firm Fixed Price. The actual cost of the element added or removed shall be reflected as a debit or credit on the Firm Fixed Priced delivered by D&P to Owner at the end of Phase IV. Unless otherwise agreed to in writing by the parties, so long as such change orders do not increase the Work beyond that set forth on worksheet attached hereto as **Exhibit D-2**, then the Work including the agreed upon change orders shall be completed for the Firm Fixed Price. All change orders shall considered [sic] an amendment to this Agreement as set forth in <u>Article 10.1</u> below.

(Agreement ¶¶ 1.3, 1.3(a).)

<u>FIRM FIXED PRICE</u>

On February 12, 2010, D&P submitted a budget to AEI to allow the parties to evaluate

the design that had developed up to that point and to provide AEI with the necessary tools to

make decisions about scope and projected costs. The budget would be refined to determine the

"Firm Fixed Price" budget. The initial budget was in the amount of approximately $1.7 million.

Subsequently, the parties communicated over the costs and scope outlined in the budget, making

various revisions.

In a letter dated March 24, 2010, D&P submitted to AEI revisions of the budget that AEI

had requested, offering two versions that deleted various components. D&P explained that

version 1 would not be acceptable because the budget fell below the threshold amount of $1 million set forth in the Agreement. The second version totaled approximately $1,030,986. In the letter, D&P also addressed the "debate surrounding lighting design scope," informing AEI that it deleted lighting design from its scope and would offer AEI a credit in the amount of $8,250 in addition to the deleted lighting design fees. D&P stated, "Hopefully this show of good faith will help to resolve the issue."

AEI responded in a letter dated March 26, 2010. AEI indicated that there were some misunderstandings of D&P's obligations under the Agreement. Specifically, AEI stated that (1) they had a different understanding as to the term "actual costs of each element" pursuant to 1.3(a) of the Agreement, and (2) it understood that D&P was to provide certain lighting design and specifications for the Exhibit. However, AEI informed D&P that it was willing to perform its obligations under the Agreement. AEI instructed D&P to amend the budget to add certain walls and items that had previously been excluded, requested a revised Line Item Budget incorporating these changes for AEI's review and approval, and directed D&P to commence Phase V.

That same day, D&P submitted a revised proposal to "reflect a mutually agreed upon Firm Fixed Price and scope" that included a spreadsheet with changes for AEI's approval. The proposed total amount was $1,113,670.40. The spreadsheet reflected, *inter alia*, that lighting design and hardware had been deleted from the scope, and that retail space was not included.

On March 31, 2010, AEI advised D&P that AEI's president, Mr. Corwin, "would be sending . . . his written confirmation of the acceptance of the costs" that day. Shortly thereafter, Mr. Corwin sent a letter, stating "AEI confirms its acceptance of the Spreadsheet and the Floor Plan and acceptance of D&P's proposal as to the scope of the work to be provided by D&P to AEI. Accordingly, AEI directs D&P to immediately commence production pursuant to Phase V

as contemplated under the Agreement." Mr. Corwin initialed each page of the spreadsheet. The

letter also indicated that a mobilization payment in the full amount was enclosed.

On May 5, 2010, AEI executed a change order that authorized D&P to provide additional

services that it requested. The change order increased the Firm Fixed Price from $1,136,074 to

$1,146,025.

ACCEPTANCE

Paragraph 9.1 sets forth the terms regarding the acceptance and warranty of the Exhibit.

This paragraph states:

> Acceptance of the [Exhibit] will be made by [AEI] following an inspection and
> completion of any punch-list correction items identified during [AEI's] inspection
> at D&P. D&P warrants that all Work performed hereunder and all elements
> provided by D&P or it subcontractors and suppliers: (a) complies with all
> obligations of D&P herein; (b) is free from defects and faults in labor and/or
> materials; (c) complies with all applicable federal, state and local codes, laws, and
> regulations; (d) conforms to the Construction Documents; and (e) conforms to
> applicable industry standards, all for a period of one-year beginning on the date of
> final acceptance of the Exhibit at the D&P facility. In addition, D&P warrants
> that all of the Work and elements provided by D&P or its subcontracts are
> merchantable, of industry standard quality, and fit for the particular purpose of
> being used as part of the a [sic] travelling exhibition.

(Agreement ¶ 9.1.) On or about May 28, 2010, the completion date set forth in the Agreement,

D&P delivered the Exhibit to AEI at D&P's Lorton, Virginia offices. AEI inspected the Exhibit

at D&P that same day and verbally identified specific items that it wanted D&P to address. D&P

addressed the items.

In June 2010, the Exhibit was delivered and installed at the Science Center. While

setting up the Exhibit in California, D&P provided additional services and modifications at

AEI's request. The show opened to the public on time on July 1, 2010. The Exhibit generated

$4.2 million at the first venue alone. After the opening of the Exhibit, through about October

2010, D&P continued to provide warranty service work at AEI's request.

At the end of June 2010, D&P communicated with its subcontractor, Geograph, the

company that fabricated and delivered the Exhibit, regarding its review of Geograph's work.

D&P identified various issues that fell into three categories: (A) potential future issues that would need immediate resolution if it comes up; (B) sub-par concerns that D&P needed to correct; and (C) general quality issues that D&P was bringing to Geograph's attention to develop collaboration and a working relationship on future projects. D&P addressed any of the identified issues that required attention or that AEI brought to D&P's attention.

Notwithstanding AEI's inspection of the Exhibit on May 28, 2010, after which the Exhibit was shipped to California, and the timely opening of the Exhibit to the public on July 1, 2010, AEI expressed its dissatisfaction with the Exhibit in a letter to D&P dated July 8, 2010. AEI informed D&P that it was not satisfied with D&P's performance under the Agreement and refused to accept the delivery of the Exhibit pursuant to paragraph 9.0 of the Agreement. AEI disputed various costs and indicated various breaches, including D&P's failure to provide services for lighting design and specification, failure to provide detail and shop drawings of individual elements including certain case work; failure to provide design elements for a retail store; failure to provide a sufficient quality and quantity of materials capable of withstanding installation, dismantling, packaging, and reinstallation necessary for a travelling exhibition, and failure to provide AEI with the actual costs (without markup) for each element of the exhibition. AEI characterizes this letter as a termination letter.

OUTSTANDING INVOICES

On May 28, 2010, D&P invoiced AEI in the amount of $422,079.65 for the work done to complete Phase V. AEI refused to pay that invoice. Thereafter, D&P delivered the Phase VI Project Closeout documentation to AEI. At the end of July 2010, D&P issued a final invoice to AEI in the amount of $66,597.90. These final two invoices were identical to the prior invoices that D&P issued to AEI.

The subject of the present dispute is the Agreement between AEI and D&P. Specifically, the dispute between the parties arises out of AEI's refusal to pay D&P for the work described in

the Agreement as "Phase V – Production and Construction," as set forth in the final two invoices. To date, AEI has paid D&P $738,239.11 for its work but has refused to pay D&P the outstanding balance in the amount of $488,677.55.

AEI claims that D&P fraudulently induced it into entering the Agreement and ultimately failed to comply with the pre-Agreement representations as well as various terms under the Agreement. AEI also maintains that D&P provided a deficient Exhibit.

On August 11, 2010, D&P filed its Complaint asserting claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and requesting declaratory judgment that D&P has no further obligations under the Agreement and is entitled to costs and fees (Count III). (Dkt. No. 1.) On November 23, 2010, AEI filed a Counterclaim against D&P and a Third-Party Complaint against S&C, asserting claims for breach of contract against both D&P and S&C (Count I); fraud in the inducement against D&P (Count II); and negligent misrepresentation against D&P (Count III).

On May 18, 2011, D&P and S&C filed a Motion for Summary Judgment. That same day, AEI filed a Motion for Partial Summary Judgment. These Motions are now before the Court for determination.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477

U.S. at 247-48. A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at

248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v.

Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact

arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the

nonmoving party's favor. *Anderson*, 477 U.S. at 248. Rule 56(e) requires the nonmoving party

to go beyond the pleadings and by its own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### III. ANALYSIS

A. <u>D&P's Contract Claim</u>

  The Court grants D&P's Motion for Summary Judgment and denies AEI's Motion for

Partial Summary Judgment as to D&P's contract claim because AEI accepted the Exhibit and

failed to pay the outstanding invoices in connection with the Firm Fixed Price that it negotiated

and agreed to with D&P.

  To prevail on a breach of contract claim, a party must show (1) a legally enforceable

obligation or agreement; (2) the opposing party's violation or breach of that obligation or

agreement; and (3) injury or damages caused by that breach. *Filak v. George*, 594 S.E.2d 610,

614 (Va. 2004.) Courts must interpret the contract according to the plain meaning of the terms,

giving effect to all words, and must not search for meaning outside the contract, where the

agreement is complete on its terms. *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983); *Globe Iron Constr. Co., Inc. v. First Nat'l Bank*, 140 S.E.2d 629, 634 (Va. 1965).

Here, AEI breached the Agreement by failing to pay its outstanding balance on the Firm Fixed Price after it accepted the Exhibit. First, pursuant to paragraph 1.3 of the Agreement, the contract had a set contract price of $1,146,025. Paragraph 1.3 of the Agreement creates a Firm Fixed Price based on the refined line-itemed budget that was finalized pursuant to negotiation and agreement of the parties. Paragraph 1.3 allows the parties to change this final price only with written agreement. When Phase IV was completed, D&P sent AEI a refined line-itemed budget setting forth the actual costs for each element of the work. The parties negotiated the terms, and D&P submitted to AEI an amended budget pursuant to the negotiations at an amount of $1,136,074 for the work to be performed thereafter. On March 31, 2010, AEI wrote that it accepted the spreadsheet itemization, the floor plan, and D&P's proposal as to the scope of the work to be provided by D&P to AEI, thus creating the Firm Fixed Price. On May 5, 2010, the Firm Fixed Price was amended pursuant to AEI's request for certain changes, revising the Firm Fixed Price to $1,146,025. AEI signed off on the change order.

Second, AEI accepted the Exhibit and, therefore, was obligated to pay any remaining balance of the Firm Fixed Price. Specifically, on May 28, 2010, D&P delivered the Exhibit to AEI at D&P's offices on schedule. D&P provided all punch-list items identified and requested. Upon completion of the inspection and punch-list items, the Exhibit was deemed accepted and the Exhibit complete pursuant to the Agreement. (*See* Agreement ¶¶ 3.1, 3.2, and 9.1.)[1] AEI failed to pay the outstanding amount of $488,677.55 of the Firm Fixed Price of the Agreement, and, therefore, D&P is entitled to summary judgment as a matter of law.

---

[1] Paragraphs 3.1 and 3.2 of the Agreement required AEI to review and approve invoices and pay the Firm Fixed Price promptly and without unreasonable delay upon satisfactory progress towards completion as shown in the project schedule and upon receipt of an acceptable invoice. Paragraph 9.1 states that completion occurred under the terms of the contract when AEI accepted the Exhibit. Acceptance will be made following an inspection and completion of any punch-list correction items identified during inspection.

The Court rejects AEI's contention that D&P is not entitled to summary judgment on its breach of contract claim because it committed prior material breaches of the contract by (1) failing to comply with the Project Schedule, (2) failing to provide actual costs to AEI, and (3) providing a deficient Exhibit, and (4) failing to submit an acceptable invoice. First, D&P's compliance with the Project Schedule is disputed; however, even assuming that D&P failed to comply with the Project Schedule, such failure does not constitute a material breach of the contract. Compliance with the Project Schedule was to be through the exercise of "best efforts." (Agreement ¶ 1.1(a).) AEI has not offered any evidence that D&P did not exercise best efforts in attempting but failing to strictly adhere to the project deadlines. Further, the Court is not persuaded by AEI's argument that this "best efforts" requirement is superseded by the Time is of the Essence Clause or the Recitals paragraph stating that D&P acknowledges that AEI will suffer various damages if it fails to perform in "strict accordance with the Project Schedule as described herein." With respect to the Time is of the Essence Clause, the more particularized best efforts provision relating directly to compliance with the Project Schedule controls. *See Bott v. N. Snellenburg & Co.*, 177 Va. 331, 339 (1941) (stating that, where there is a contradiction in terms, "a general provision in a contract must give way to a special one covering the same ground"). In addition, the terms, when read together, indicate that the important deadline is the opening date, and compliance with the Project Schedule merely assisted in meeting that critical date. As set forth expressly in the Agreement, the date of "critical importance" was that of the opening of the Exhibit on July 1, 2010. Moreover, the parties agreed to use best efforts in complying with the Project Schedule supports this interpretation. The statement that obligations must be performed in "strict accordance" with the Project Schedule is included in the context of the paragraph that states (1) that the date of critical importance is the opening date and (2) D&P is acknowledging that Owner will suffer damages for failure to strictly comply with the Project Schedule. This acknowledgment informs and gives meaning to the later term that requires D&P to use best

efforts to comply with the Project Schedule. Specifically, the parties must use best efforts to comply with the Project Schedule in order to meet the date of critical importance, which is the opening date. Accordingly, under the plain meaning of the terms of the entire Agreement, when read together, D&P's alleged failure to meet the Project Schedule was not a material breach because D&P was only required to exercise best efforts in working to comply with the schedule, and AEI offered no evidence that D&P's failed to exercise best efforts.

Second, AEI's nonperformance is not excused by D&P's alleged failure to disclose actual costs because AEI offered no evidence that D&P failed to disclose actual costs. Paragraph 1.3(a) requires D&P to submit "a refined line-itemed budget setting forth the actual costs for each element (i.e., casework, walls, lighting, audiovisual software, and hardware, etc.) of the Work" at the end of Phase IV. (Agreement ¶ 1.3(a).) AEI admits that, when it received the refined line item budget in the amount of $1,499,853 "showing actual costs," it learned for the first time of various charges that D&P had included in its calculation of actual costs. AEI does not assert that there the budget included other undisclosed costs. Thus, D&P met its obligation under the Agreement. The fact that the parties never previously discussed these costs, that these costs were not identified in any prior budget, or that they did not comport with AEI's understanding of actual costs is immaterial under the terms of the contract. D&P was required to disclose its costs, which, as AEI concedes, it did. Accordingly, AEI's nonperformance is not excused by D&P's alleged failure to disclose actual costs because D&P did not breach the Agreement.

Finally, AEI's nonperformance is not excused by D&P's alleged provision of a deficient exhibit because AEI has not offered the requisite expert testimony to prove that the Exhibit was deficient. The Agreement sets forth the standard that the Exhibit needed to meet: "the Work shall be of a museum quality consistent with a traveling exhibition and all of the physical elements provided by D&P for the Exhibitions shall be of sufficient quality to withstand installation, dismantling, packaging, transportation, and re-installation . . . ." (Agreement ¶ 1.6.)

The nature of the project, involving architecture, design, and production and requiring the product to be of "museum quality" is highly technical in nature. To prove the standard required in highly technical professions, expert testimony is required unless the matters pertaining to duty and breach are obvious from ordinary human knowledge and experience. *Nelson v. Commonwealth*, 235 Va. 228, 236 (1988). For example, Virginia law requires expert testimony to set forth the proper standard of care with respect to the practice of architecture. *Id.* Because the standard that D&P had to meet in the design and production of this Exhibit and whether it conformed to that of "museum quality" is highly technical and outside the knowledge of a layperson, expert testimony is required. Whether the alleged deficiencies that AEI cites constitute a breach of the standard of care is outside the knowledge of a layperson and demonstrates further that expert testimony is needed in this case. Thus, AEI fails to prove that its nonperformance is excused because it failed to offer expert testimony and, therefore, fails to prove that D&P breached the Agreement by providing a deficient Exhibit because it failed to offer expert testimony to prove the alleged deficiencies in the Exhibit. Thus, AEI's nonperformance is not excused. For these reasons, the Court grants D&P's Motion for Summary Judgment and denies AEI's Motion for Partial Summary Judgment as to D&P's contract claim.[2]

B. D&P's Claim for Declaratory Judgment

The Court grants D&P's Motion for Summary Judgment as to its request in Count III of its Complaint that the Court declare that D&P has no further obligations under the Agreement, including but not limited to any obligation to provide close-out documentation or warranty services. Once a party to a contract materially breaches the contract, the other party is relieved of all continuing obligations under the contract, and the first breaching party may not sue to

---

[2] Neither party specifically addressed D&P's claim for breach of the implied covenant of good faith and fair dealing (Count II). The Court will dismiss this claim *sua sponte* because such a claim is not applicable under Virginia common law "when parties to a contract create valid and binding rights," *Ward's Equip. Inc., v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (Va. 1997), and the Uniform Commercial Code does not apply to this Agreement.

enforce subsequent breaches by the other party. *See Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997). A material breach occurs when a party fails to fulfill an obligation in a contract that is so important and central to the contract that the failure defeats the very purpose of the contract. *Elite Entm't, Inc. v. Khela Bros. Entm't, Inc.*, 396 F. Supp. 2d 680, 693 (E.D. Va. 2005).

Here, as discussed above, AEI breached the contract by failing to pay the outstanding balance, even though the Exhibit was completed and accepted as defined in the Agreement. Therefore, as a matter of law, AEI's material breach relieves D&P of any further obligations under the Agreement subsequent to the date at which AEI's payment of its outstanding balance was due. Accordingly, the Court grants D&P's Motion for Summary Judgment and denies AEI's Motion for Partial Summary Judgment as to D&P's claim for declaratory relief (Count III).

C. AEI's Breach of Contract Claim

The Court grants D&P's Motion for Summary Judgment and denies AEI's Motion for Partial Summary Judgment as to AEI's breach of contract claim against D&P and S&C. Most of the arguments that apply to AEI's claim are discussed above in connection with D&P's contract claim. Accordingly, they will only be summarized briefly here.

First, as an initial matter, the Court holds that S&C is not bound by all terms of the D&P/AEI Contract that apply to D&P, and, therefore, much of AEI's contract claim does not apply to S&C because S&C was not responsible for the portions of the Agreement that were allegedly breached. S&C does not stand in the place of D&P and cannot be held jointly and severally liable for breaches obligations under the Agreement for which D&P and not S&C was directly responsible. S&C executed a joinder to the Agreement between D&P and AEI "for the purpose of agreeing to (i) perform its obligations in accordance with its agreement with D&P, and (ii) continue to perform its obligations directly for [AEI] in the event D&P defaults on its obligations under the [D&P/AEI Agreement] and/or D&P's agreement with [S&C]." Accordingly, S&C agreed that "if it breaches is [sic] obligations or otherwise fails to perform in

accordance with the [D&P/AEI Contract] and/or D&P's agreement with [Seruto], [AEI] shall have all rights and remedies available at law or equity to enforce its rights hereunder . . . ." (Agreement 11, Contract Joinder.)  Under the plain meaning of the express language of the joinder, S&C joined the Agreement for the sole purpose of performing its obligations in accordance with its agreement with D&P and continuing its own obligations in the event of a D&P default on either contract.  The joinder does not require S&C to take the place of D&P in the event of default, nor does it assign S&C with D&P's responsibilities or liabilities in the event of a D&P default.  Moreover, while S&C agreed to perform in accordance with the D&P/AEI Contract, this obligation must be read consistently with the previously-stated purpose of S&C's joinder.  Thus, the only provisions of the D&P/AEI Contract that apply to S&C are those that do not contradict or add to S&C's obligations under its contract with D&P, and S&C is entitled to summary judgment as to any alleged breach of a provision that applies solely to D&P.

Second, D&P and S&C are entitled to summary judgment as to AEI's claim that it breached the contract by not complying with the Project Schedule.  As discussed above, D&P was entitled to exercise best efforts in complying with the schedule, and AEI failed to offer evidence that it did not do so.  Similarly, AEI has failed to offer any evidence that S&C failed to exercise best efforts in complying with the Project Schedule, so S&C is also entitled to summary judgment as to AEI's claim that S&C breached the Agreement by failing to comply with the Project Schedule.

Third, D&P is entitled to summary judgment on AEI's claim that D&P breached the Agreement by charging AEI costs that were not part of the Agreement, such as burdened labor costs, because AEI agreed to the costs that then became Firm Fixed Price of the contract.[3]  As stated previously, under paragraph 1.3(a) of the Agreement, a Firm Fixed Price was established upon the negotiation and agreement of the itemization of costs set forth in the refined line-itemed

---

[3] This alleged breach is stated only against D&P.

budget. The parties negotiated the itemization, and AEI ultimately accepted the budget and authorized the project to proceed. Thus, AEI authorized any additional profit or burdened labor costs that were incorporated in the budget. When AEI reviewed and accepted this budget, it became the Firm Fixed Price, so AEI cannot now argue that any costs were unauthorized. Moreover, the Agreement does not contain any provisions setting a profit margin or prohibiting the charge of unburdened labor costs. Accordingly, D&P is entitled to summary judgment on AEI's claim that it breached the Agreement by charging costs that were not part of the Agreement because the Agreement does not set a profit margin or prohibit unburdened labor costs, and AEI agreed to the costs, which ultimately became the Firm Fixed Price controlling the Agreement.

Fourth, D&P and S&C are entitled to summary judgment on AEI's claim that they breached the contract by failing to provide lighting services and a retail store for which AEI contracted. Again, AEI approved the refined line-itemed budget, which incorporated the Firm Fixed Price spreadsheet, defining the scope of the work. The spreadsheet expressly states that the retail store was not included, and the lighting was deleted from the scope. AEI approved these changes in writing, thus confirming the limitation of the scope of the work to be performed pursuant to the Agreement. Moreover, the written proposal and written acceptance of this refined line-itemed budget and spreadsheet satisfies the contract provision that allows contract changes to be made through the execution of written change orders that are mutually agreed to by the parties.

In addition, with respect to the deletion of the lighting, this claim was satisfied by the doctrine of accord and satisfaction. "Accord and satisfaction is a method of discharging an obligation under a contract or cause of action, where the parties agree to give and accept something in settlement of the claim or demand of the one against the other . . . ." *Lindsay v. McEnearney Associates, Inc.*, 260 Va. 48, 54 (2000) (citation and internal quotation marks

17

omitted).  "The thing agreed to be given or done in satisfaction must be offered and intended by

the debtor as full satisfaction, and accepted as such by the creditor."  *Id.*  (citation and internal

quotation marks omitted).  "The acceptance, of course, may be implied, and as a general rule,

where the amount due is unliquidated, *i.e.,* disputed, and a remittance of an amount less than that

claimed is sent to the creditor with a statement that it is in full satisfaction of the claim, or is

accompanied by such acts or declarations as amount to a condition that if accepted, it is accepted

in full satisfaction, and the creditor accepts it with knowledge of such condition, then accord and

satisfaction results."  *Id.* (citation and internal quotation marks omitted).  Here, in negotiating the

refined line-itemed budget, a debate arose regarding the scope of lighting design.  Consequently,

in a letter dated March 24, 2010, D&P wrote that it was deleting lighting design from the scope

and offered AEI an $8,250 credit in addition to the deleted lighting design fees to show good

faith in hope of resolving the issue.  Ultimately, AEI accepted the revised refined line-itemed

budget with this deletion as well as the credits and reduction in fees.  Such acceptance satisfies

the elements of accord and satisfaction.  Although AEI informed D&P that it understood that

D&P was required to provide lighting design and specifications, given the subsequent acceptance

of the refined line-itemed budget with these changes, the reduction in fees, and the credit, the

Court rejects AEI's position that it retained its contract rights with respect to the lighting and

finds that the obligations were discharged under the theory of accord and satisfaction.

Accordingly, AEI's claim that D&P and S&C breached the Agreement by failing to provide

certain services fails.

Finally, D&P and S&C are entitled to summary judgment on AEI's claim that they

breached the Agreement by providing deficient services.  As stated previously, AEI's claim fails

because they do not have the requisite expert testimony to establish the design, architecture, or

"museum quality" standard, and, therefore, they cannot prove that D&P and S&C breached the

contract by failing to meet this standard.  For these reasons, the Court grants D&P Motion for

Summary Judgment and denies AEI's Motion for Partial Summary Judgment as to AEI's

contract claim.

D.  AEI's Fraudulent Misrepresentation Claim

      The Court grants D&P's Motion for Summary Judgment and denies AEI's Motion for

Partial Summary Judgment as to AEI's fraudulent misrepresentation claim because the alleged

misrepresentations do not support a cognizable claim, and AEI fails to offer evidence of the

requisite intent element.  A party alleging fraud must prove by clear and convincing evidence (1)

a false misrepresentation, (2) of a material fact, (3) made intentionally and knowingly, (4) with

intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party. *Van

Deusen v. Snead*, 247 Va. 324, 441 (1994).

      To be actionable in fraud, the misrepresentation "must be of an existing fact . . . ." *Cohn

v. Knowledge Connections, Inc.*, 266 Va. 362, 368 (2003).  Moreover, a fraud clam "cannot

ordinarily be predicated on unfulfilled promises or statements as to future events." *Enomoto v.

Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 454 (E.D. Va. 2009).  If a plaintiff's claim depends

on unfulfilled promises, a plaintiff must demonstrate with clear and convincing objective

evidence that a defendant intended, at the time of the alleged promise, not to honor its promises.

*Petra Int'l Banking Corp. v. First Am. Bank of Va.*, 758 F. Supp. 1120, 1139 (E.D. Va. 1991);

*see Connelly v. Gen. Med. Corp.*, 880 F. Supp. 1100, 1118 (E.D. Va. 1995).

      Further, to be actionable in fraud, a plaintiff's reliance on any alleged misrepresentation

must be both reasonable and detrimental.  A party to a contract may not reasonably rely on oral

statements that are contradicted by the plain terms of the written agreement. *See Foremost Guar.

Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 126 (4th Cir. 1990).

      Here, AEI's claim fails as a matter of law because (1) the alleged misrepresentations do

not constitute existing facts, (2) AEI fails to offer evidence that D&P had the intent not to

perform these future promises, (3) AEI waived its rights with respect to this claim, and (4) the

contrary terms in the written agreement control. First, D&P's alleged representations that they would disclose to AEI the actual costs of each component of services, that it would provide the services at the actual cost plus a markup for profit equal to 15% of the actual cost, and that it would provide the Exhibit for a total price of $1 million do not constitute existing facts but, rather projections of future event. Even assuming that D&P made these alleged misrepresentations, AEI has not offered objective evidence establishing that D&P had no intent of performing its obligations. For example, with respect to the representation to disclose actual costs, the Agreement even contained provisions addressing this issue and demonstrating that D&P intended to disclose actual costs. (*See, e.g.,* ¶ 1.3(a) (requiring D&P to deliver to AEI a refined line-itemed budget setting forth the actual costs for each element); ¶ 3.5 (requiring D&P to maintain evidence as may be appropriate to substantiate costs incurred under the Agreement).) Moreover, evidence of D&P's alleged practice to add overhead charges or burdened labor to the actual costs of its sub-contractors does not prove that D&P had no intent of disclosing actual costs in this case, especially where the written Agreement expressly requires D&P to do so. Further, AEI offers no evidence that D&P did not intend to provide the services at the actual cost plus a markup of 15%, especially where the evidence demonstrates a markup of 10%. Finally, AEI offers no evidence that D&P did not intend to fulfill its obligations within a $1 million limit. The pre-contract internal emails that AEI offers do not indicate that D&P had no intention of complying with the alleged budget. When read together in the context of the discussions between the parties, the emails demonstrate that there were ongoing discussions about the budget, and the budget would necessarily change depending on the addition of certain elements to the exhibit by AEI. Further, the Agreement expressly provides for a budget between $1-1.5 million, depending on if upgrades are added, indicating that there was no $1 million fixed limit.

Second, AEI waived this claim when it approved a budget in excess of $1 million. *See Link Assocs. v. Jefferson Standard*, 291 S.E.2d 212, 216 (Va. 1982) (stating that a waiver must

be distinctly made with full knowledge of the rights waived, and this knowledge and intention must plainly appear). The Agreement allows for waivers when they are set forth in writing and executed by the parties. (Agreement ¶ 17.1.) AEI's knowledge and intention to waive its rights was clearly demonstrated by the fact that the refined-item budget that plainly was in excess of $1 million was negotiated and accepted by AEI in writing. Accordingly, knowing of its budgetary concerns and still accepting a budget in excess of $1 million, AEI waived this claim.

Finally, under the tort principles identified above and the merger clause in section 16.0 of the contract, which states that the contract constitutes the entire agreement and supersedes all previous negotiations or proposals, the terms of the written agreement control where there is an inconsistency in statements. For these reasons, AEI's fraudulent inducement claim fails as a matter of law.

## E. AEI's Negligent Misrepresentation Claim

The Court grants D&P's Motion for Summary Judgment and denies AEI's Motion for Partial Summary Judgment as to AEI's negligent misrepresentation claim because the alleged misrepresentations do not support a cognizable claim for constructive fraud, and the allegations are governed by the parties' contractual obligations and, therefore, cannot give rise to an action in tort.

While Virginia does not recognize a claim for negligent misrepresentation, it appears that AEI is asserting a claim for constructive fraud under Virginia law. The elements of constructive fraud are identical to that of a claim for actual fraud, except for the intent element. For constructive fraud, a representation need only be made innocently or negligently, rather than intentionally and knowingly. *Sales v. Kecoughtan Hous. Co., Ltd.*, 279 Va. 475, 690 S.E.2d 91, 94 (Va. 2010). "Constructive fraud requires that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of reliance upon the misrepresentation." *Poth v. Russey*, 281 F. Supp. 2d 814, 824 (E.D. Va. 2003) (citation and

internal quotation marks omitted).  While a single act can give rise to a claim for breach of

contract and a common law duty arising in tort, to maintain both a breach of contract and a

tortious breach of duty, "the duty tortiously or negligently breached must be a common law duty,

not one existing between the parties solely by virtue of the contract." *Id.* (citation and internal

quotation marks omitted).

Here, AEI's claim fails given that the alleged misrepresentations constitute promises of

future action, which representations cannot support a claim for constructive fraud because a

constructive fraud claim does not permit a claim based on promises of future action. *See*

*Supervalu Inc. v. Johnson*, 276 Va. 356, 368 (2008).  In addition, AEI's claim fails as a matter of

law because the allegations relate to obligations that arise from the contract, not from a common

law duty actionable in tort.  Specifically, D&P's alleged representations that it would disclose

actual cost information, that it would provide the Exhibit at the actual cost plus a markup for

profit equal to 15% of the actual cost, and that it would provide the Exhibit for a total price of $1

million dollars are expressly governed by paragraph 1.3 of the Agreement dealing with cost and

pricing.  Thus, the duty breached arises out of the Agreement, and, therefore, AEI's claim in tort

for constructive fraud fails as a matter of law.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants D&P's Motion for Summary Judgment as to

all claims and denies AEI's Motion for Partial Summary Judgment as to all claims.  In addition,

the Court denies D&P's Motion in Limine and Motion to Strike as moot.

Accordingly, it is hereby

ORDERED that Plaintiff/Counter-Defendant Design and Production, Inc. and Third-

Party Defendant Seruto and Company's Motion for Summary Judgment as to all claims is

GRANTED and Defendant/Counter-Plaintiff/Third-Party Plaintiff American Exhibitions, Inc.'s

Motion for Partial Summary Judgment is DENIED.  It is further

ORDERED that Design and Production, Inc. and Seruto and Company's Motion in

Limine Regarding Portions of Depositions in Which Marcus Corwin Participated as Counsel is

DENIED as moot.  It is further

ORDERED that Design and Production, Inc. and Seruto and Company's Motion to Strike

AEI's Trial Exhibits is DENIED as moot.

The Clerk is directed to enter judgment in favor of Plaintiff/Counter-Defendant Design

and Production, Inc. and Third-Party Defendant Seruto and Company and against

Defendant/Counter-Plaintiff/Third-Party Plaintiff American Exhibitions, Inc. in the amount of

$488,677.55 plus prejudgment interest at 1.5% per month pursuant to Federal Rule of Civil

Procedure 58.  A separate Rule 58 Judgment Order will be entered with the Memorandum

Opinion.

The Clerk is directed to forward a copy of this Order to counsel.

Entered this _16F_ day of September, 2011.


Alexandria, Virginia
9/6/11

_____/s/_____
Gerald Bruce Lee
United States District Judge